PRUDENTIAL INS. CO. OF AMERICA v. LIBERDAR HOLDING CORPO-
RATION.

SAME v. LAND ESTATES, Inc.

VAN SCHAICK v. WILLIAMS et al.

No. 493.

Circuit Court of Appeals, Second Circuit.
Aug. 7, 1934.

396

Greenbaum, Wolff & Ernst, of New York City (Lawrence S. Greenbaum, of New York City, Hyman W. Kehl, Theodore S. Jaffin, Benjamin Kaplan, and Justin N. Reinhardt, all of New York City, of counsel), for rehabilitator.

Engelhard, Pollak, Pitcher, Stern & Clarke, of New York City (Carl S. Stern, Murray I. Gurfein, and Isadore Polier, all of New York City, and Maurice Ravage, of Long Island City, N. Y., of counsel), for receivers.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

▮ The controversies which these appeals concern, arose in the following way: The New York Title & Mortgage Company had for many years been engaged in the sale and guaranty of mortgages. Among other forms of security which it issued were "Guaranteed First Mortgage Certificates." These were created as follows: The company, being the mortgagee of many mortgages on separate parcels of land, would deposit a number of them in a pool with a depositary. Against each pool it issued certificates of different amounts to investors, by which it purported to assign to the holder of the certificate an aliquot share in all the mortgages deposited in the pool, and "guaranteed" payment to him of the amount of his investment within ten years, together with interest meanwhile. We are freed from an independent analysis of the rights and obligations which resulted from these transactions, because the Court of Appeals of New York in People, by Van Schaick, v. Title & Mortgage Guarantee Co., 264 N. Y. 69, 190 N. E. 153, has settled them in a decision which we must treat as authoritative, regardless of our own judgment. The court there held that certificate holders had an interest in the assigned mortgages only as security for the direct obligation of the company to repay their advances; that in substance the situation was the same as though the company had borrowed money of the holders on notes, and pledged the pooled mortgages to secure them. The certificates made the company the holders' exclusive agent to collect the principal and interest of the pooled mortgages, "to decide when and how to enforce any provision of the said bonds and mortgages and in its own name to enforce the same, and in all respects to pursue any remedies which any owner * * * might pursue; * * * to withdraw from deposit deposited bonds and mortgages and to substitute other first mortgages * * * in their place, to such an amount that the principal sum * * * shall never be less than the principal sum of the outstanding Certificates."

Before March 15, 1933, many of the mortgages had fallen into default, and it had become necessary to take some action upon them. For this purpose the company used the two defendant companies which it had organized to take over mortgaged properties, which it wholly owned, whose officers it appointed, and which it entirely dominated. In New York it is possible to foreclose a mortgage "partially," that is to say, to leave outstanding as a lien so much of the principal as is not due, and to sell the equity for accrued interest, taxes, and past due installments of principal. Civil Practice Act N. Y. § 1086. In the case of some of the parcels of property here in question the company used the defendants to effect such partial foreclosures, usually assigning to one of them the defaulted mortgage for that purpose. The subsidiary bought in the equity, paid the

charges, generally with the company's money, and when all was completed, reassigned the mortgage, which the company redeposited in the pool. The result was the same as before the mortgagor's default, except for any installments of principal which had become due and been wiped off by the foreclosure; the subsidiary had merely stepped into the place of the original mortgagor, and the interest, taxes, and installments had disappeared from the lien. So far as the principal had been reduced, the company was bound to supply its place with other mortgages, and presumably did so; at least the contrary does not appear. These constituted what are called "Class I" parcels; among them are four, which were bought in after March 15, 1933, which the receivers have agreed to convey to the petitioner, and which for this reason we ignore.

"Class II" was of another kind. At times the company, having withdrawn a defaulted mortgage from a pool, would direct a defendant to take in the land by full foreclosure, or by a deed from the mortgagor, thus merging it with the equity. It would then cause the defendant to execute a new bond and mortgage, which it would put into the pool. In some cases it may be assumed that the new mortgage went back into the old pool. The properties so held by the defendants were managed through a third subsidiary, Nyamco, which collected the rents and performed the usual services of a real estate agent, paying the balances over to the defendants.

The company defaulted on the certificates on March 15, 1933, and the holders were thereafter paid, if at all, only as the rents permitted. So matters stood until August 4, 1933, when a "Rehabilitator" was appointed, about whom it is necessary to say no more than that he is authorized to represent not only the company but the certificate holders individually. On August 18, the District Court appointed receivers for the two defendants, and they have received some part of the rents collected by the defendants since March 15, 1933, and have themselves collected those which fell due after they went into possession. On January 20, 1934, the "Rehabilitator" filed this petition as to one piece of land, which he enlarged on the twenty-fifth to cover all the rest now at issue. His position is that when a defendant bought in a parcel on partial foreclosure (Class I), or gave a mortgage upon a parcel fully foreclosed (Class II), it took it in trust for the holders, and not only must it convey the parcel to him as their representative, but its receivers must account to him for the rents

from the date it got possession. The judge held that as to Class I the defendants did acquire the land in trust, and must convey and account for the rents from the time of their acquisition. As to Class II he held that the defendants need not convey, holding as mortgagors until foreclosure deed, but he directed an accounting of rents from September 7, 1933, when, as he found, the "Rehabilitator" had demanded the rents. Both sides appealed.

As to Class I we cannot agree that when one of the defendants bought in a property upon partial foreclosure or got a deed from the mortgagor, it held it thereafter in trust for the holders. Even if the foreclosure had wiped out the lien of the mortgage in toto, it would be difficult in the face of the holding of the Court of Appeals to say that the title was thereafter held in trust. The mortgage itself had been mortgaged; the land when bought in on foreclosure was its substitute and was only held as security. After the company's default, the holders' position was still that of mortgagees, and they would not be entitled to a deed except after they had in turn bought in the property. But in any event that question is not before us. The partial foreclosures did not affect the lien of the mortgage at all, except as to past due installments. The position of the holders otherwise remained exactly what it was when the mortgage was originally deposited in the pool; all that had happened was that the land had been cleared of other liens, taxes, interest and the like which had accumulated. The defendant, acting for the company, had taken in the equity, by which it might indeed indemnify the company for the advances by which these liens were paid, but which could not affect the lien of the mortgage, being junior to it. Provided the company filled up the pool with other mortgages to the extent of any installments of principal which had been discharged, the position of the holders was improved so far as it was changed at all. The petitioner's argument confuses the lien with the land; only the first was the security; a guarantor, or even a trustee, was free to deal at will with the land so far as he did not prejudice the lien. Of course a trustee may not buy in the trust estate to his own advantage; it is not necessary to labor that doctrine which is settled by multitudinous decisions. There is however no more objection to a trustee's buying an interest junior to the trust estate than to his buying any other property; such a purchase cannot possibly create any interest adverse to the cestui que trust. Bevan v. Webb, [1905] 1 Ch. 620;

Palmer v. Taylor, 235 N. Y. 367, 139 N. E. 478; Anderson v. Lemon, 8 N. Y. 236, 237 (semble); Kennedy v. Keating, 34 Mo. 25; Mead v. McLaughlin, 42 Mo. 198; Britton v. Lewis, 8 Rich. Eq. (S. C.) 271. Cf. Miami M. & G. Co. v. Drawdy, 99 Fla. 1092, 127 So. 323. The decree is reversed as to Class I.

■ As to the parcels in Class II, the defendants were the very mortgagors, and if they are to be regarded as persons juristically separate from the company, no debate is possible; the mortgage must be foreclosed before the mortgagee became entitled to a deed. It is of no moment that the land was once mortgaged by an outsider, taken in on foreclosure and mortgaged again. If the amount of the new mortgage was properly apportioned to any change in value of the land, and if the pool was kept to its proper level, this was altogether proper. If on the other hand the defendants are to be regarded as one with the company the result is the same. In that view there never was a mortgage to the company, the land was in effect directly mortgaged to the holders. That indeed would falsify the obvious intent of the parties, who had agreed that mortgages, not land, should be the security, but we may disregard even that; for the holders would still be only mortgagees, and they must foreclose to get title. In re Gilbert, 104 N. Y. 200, 10 N. E. 148. The judge was clearly right as to Class II and the decree is affirmed.

■ The last question is as to the rents. Until March 15, 1933, the holders had no interest in these on any theory; the petitioner's claim to them falls with his underlying claim that he was entitled to a deed as of the moment of purchase on foreclosure. Even if the company had bought in its own name it would have been entitled to the profits. Fearcy v. Williams et al., Receivers of Liberdar Holding Corp., 72 F.(2d) 263 (C. C. A. 2). After default it was however bound to apply for a receiver of the rents of any mortgage that was itself in default, and the holders may treat it as a trustee for them of that power. This follows from the nature of the transaction. As between the company—a mortgagee—and the several mortgagors it is well settled that, although the mortgagors remained entitled to the rents so long as the mortgagee did not take possession—either by consent or through a receiver—the mortgagee could have procured a receiver, unless the property was plainly adequate security, which we may assume not to have been true in view of the results of the foreclosures. This power of the company as mortgagee it had agreed to hold as agent of the certificate holders. While it kept up its own payments of principal and interest the holders were not entitled to the benefit of this power, whether mortgagees, or pledgees, of the mortgages. In re Sweeney, 212 F. 1 (C. C. A. 3). But as soon as the company did default, they became entitled to the profits of the mortgages, and as the mortgagors had stopped paying interest, to their substitute, the rents. They had no power to sequester the rents themselves, not being mortgagees, but they could compel the company to use its own power in their interest; the company held it in trust for them from that time forward.

Even so, this would not have impounded the rents against a mortgagor or an owner of the equity until the company had acted. The company might be liable, but the mortgagor could answer that that was a matter between itself and its cestuis que trustent; that the rents should remain where they were until the company moved. But the relations between the company and the defendants forbid any such immunity; they were not ordinary mortgagors. We will indeed treat them as juristic persons, independent of the company, quite as though they were natural persons. Nevertheless they were completely subservient to it, just as natural persons might have been. They were organized only to hold the lands for it, they were subject to its directions as to when to take a parcel, how long to hold it and what to do with it. They had made themselves coadventurers with the company touching these lands, and if the company wrongfully failed to sequester the rents upon defaulted mortgages, they could not stand upon the point that as mortgagors they might withhold the profits until the mortgagee had secured possession in invitum. Thus they were charged with the same fiduciary relation to the rents as the company itself; as creatures of the holders' agent, they became themselves agents of the holders. After March 15, 1933, they and the receivers after them received the rents in trust.

■■ We are asked to decide certain questions which will arise upon the accounting, a doubtful procedure, for the evidence may make the issues appear quite different at a hearing. However, we think that we may now safely go as far as the following: For the period between March 15, 1933, and August 18, 1933, the petitioner in order to recover must trace the rents received into some property which reached the receivers' hands; he is proceeding in rem. This will be the limit of his recovery, but he may get less. This will be true if it appears that the defendants made allowable payments which they did not take out of the

rents; those payments will be the same as those which the receivers may deduct. No allowance will be made to the defendants for their services in taking care of the properties, but in so far as the Nyamco Company withheld any commissions, these will of course be allowable; indeed they were presumably taken out of the rents before the defendants received them. In the period from August 18, 1933, forward, the receivership period, the receivers will charge themselves with the rents received, less any deductions taken by the Nyamco Company, if it was the collecting agent. They will be allowed any taxes paid, no matter when these fell due. Taxes are necessary payments and benefit the property; they were not a charge against the defendants, for the company had never contracted to pay them. Its liability and the defendants' are merely as trustees of the rents, and they are entitled to any credits which any trustee might take. The promise of the company to pay interest and principal had nothing to do with its obligation as trustee of the rents. The holders may not in this way secure a preference over other creditors. Besides, the defendants made no such promise and are not liable for its breach; they are liable at all only because they so associated themselves with the company in the management of the property as to be liable as joint principals. In addition to taxes the receivers will be allowed any expenses reasonably suitable for the upkeep and maintenance of the property. It is unsafe to be more specific; we must leave the particulars for agreement or for a hearing before a master. The receivers and the defendants were not guilty trustees. It seems to us that some allowance should also be made for the general costs of administration. It is quite true that if the petitioner made a demand upon the receivers and they refused it, their possession was wrongful from that time forward. Thus it might seem as though we ought to decide whether the letter of September 7, 1933, was such a demand, and, if so, whether the wrong of the receivers in disregarding it should be charged to the estate. We do not however think that this is necessary. The holders could not themselves collect the rents and care for the property; that had to be done either by the petitioner or by the receivers. The receivers' care was as much a benefit to the holders as the petitioner's; they should not receive it gratis merely because the receivers saw fit to test their rights. The District Court should therefore fix an allowance at the benefit which the properties received from the receivers; it should not however be greater than what the same care would have cost, had the petitioner been in possession. This allowance is obviously not to be limited to actual expenses; it will include parts of the receivers' "overhead," so far as there would have been a corresponding "overhead" in the petitioner's management. We cannot give any more particular directions. Again, in marshalling allowable expenses, each pool should be treated as a unit. The company, being charged as fiduciary for each pool separately, would be entitled to use the surplus rents of one parcel of land to keep down the taxes and other expenses of other parcels in the same pool; indeed that would be its duty. The defendants' duties ran parallel with the company's for the reasons we have given; so do the receivers', who merely continue the trust under which the defendants held their possession. In view of our decision, we do not suppose that anybody will consider the receivers' disclaimers are material. In any event they should be disregarded. Receivers may disclaim properties which are burdensome to the estate, but these they held, not as receivers for the general creditors, but for the certificate holders.

Decree reversed; cause remanded for further proceedings in accordance with the foregoing.